581 So.2d 121 (1991)
Tony Leon HAYES, Appellant,
v.
STATE of Florida, Appellee.
No. 75040.
Supreme Court of Florida.
May 23, 1991.
Rehearing Denied July 8, 1991.
*122 James B. Gibson, Public Defender and Christopher S. Quarles, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Barbara C. Davis, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Tony Leon Hayes appeals from his convictions of first-degree murder and other offenses, and the imposition of the sentence of death.[1] We affirm.
Evidence showed that on July 20, 1988 in Daytona Beach, Hayes and his friends, Nathan Watson and Anthony Gillam, conspired to rob and shoot a taxicab driver. The jury heard firsthand accounts of the crime from Watson and Gillam, both of whom testified after pleading guilty to second-degree murder and armed robbery. According to their testimony, Hayes, Watson, and Gillam spent the evening drinking beer and consuming cocaine and marijuana. At some point that evening they walked to the Bethune Cookman College campus where they discussed finding ways to raise money to buy more cocaine. Gillam proposed that they rob a taxicab driver. Hayes pointed out that they would have to shoot the driver because taxicab drivers are known to carry guns. When the others were reluctant, Hayes volunteered to do the shooting. They borrowed a .25-caliber handgun from a friend of Gillam and walked to the Greyhound bus station. Hayes told the others that Watson would sit in the front with the driver while he and Gillam sit in the back. Then, Hayes would have the driver turn onto a street he knew, at which time he would shoot the driver and Watson would seize control of the car.
When they arrived at the bus station shortly before midnight, Hayes phoned for a taxicab. A cab arrived a few minutes later, driven by the victim, Thomas Pabst. As they had planned, Watson sat beside the driver, Hayes sat behind the driver, and *123 Gillam sat next to Hayes. During the ride, Hayes shot Pabst in the back of the neck. The shot severed his spinal cord, probably rendering Pabst unconscious immediately and causing his death within seconds or minutes. The taxi careened off the road and came to a halt when it tore through some bushes and struck a tree in the back yard of a nearby home. Gillam and Watson attempted to wipe off fingerprints from the taxi[2] while Hayes pulled Pabst's body out of the car and went through his pockets, taking about forty dollars in cash before they fled. Hayes and Watson ran off together in one direction and Gillam ran off another way.
Other witnesses testified that they saw Watson and Hayes at the scene of the crime. Furthermore, two sisters, one of whom had dated Hayes, testified that Hayes acknowledged involvement in the crime, and one of the sisters said Hayes admitted he was the one who shot Pabst.
In the penalty phase, uncontroverted evidence showed that Hayes, eighteen at the time of the murder, was the product of a neglectful, abusive, and deprived environment. His father deserted him during infancy, and his stepfather physically abused him from the age of thirteen or fourteen until Hayes managed to leave home permanently a year or two later. His mother neglected him as a child, leaving him alone for days or weeks at a time, forcing him to virtually raise himself. During one period of his childhood, Hayes was forced to sleep in abandoned cars or on park benches.
A clinical psychologist, Dr. Malcolm Graham, testified that Hayes had been a heavy drinker since the age of fifteen and experienced multiple blackouts and memory loss. Dr. Graham described Hayes as immature and functionally illiterate with the reading, spelling, and arithmetic skills of a five-year-old child. His IQ of seventy-four placed him in the borderline range of intellectual ability, and he had poor judgment skills. Dr. Graham found that Hayes suffers from central nervous system dysfunction, particularly in the left parietal and central lobes of the brain, the areas that typically deal with reading, writing, spelling, and arithmetic. Hayes began heavily consuming alcohol on a regular basis at the age of fifteen, drinking as much as three and one-half six packs of beer and a fifth of "Mad Dog 20-20" each day for three years prior to the murder. In addition to the alcohol, Hayes had been smoking on the average of five marijuana cigarettes a day for three years, plus periodic consumption of cocaine. Nonetheless, Hayes never received any counseling or rehabilitative treatment. Dr. Graham said drug use coupled with low intellectual functioning and central nervous system dysfunction combine to increase the probability of aggressive behavior. In Dr. Graham's opinion, Hayes's ability to conform his conduct to the requirements of law was impaired on the day of the crime due to drugs and alcohol, although it is unclear as to how much alcohol and drugs were consumed in the few hours immediately preceding the murder. Additionally, he believed that Hayes knew the difference between right and wrong when the crime occurred. Hayes does not suffer from any serious emotional disturbance and would be able to stabilize and perform very specific kinds of manual labor if he is kept free of drugs and alcohol, Dr. Graham concluded.
Hayes was convicted of first-degree murder, armed robbery with a firearm, conspiracy to commit first-degree murder, and conspiracy to commit armed robbery. The jury recommended death by an eleven-to-one vote. The trial court imposed the death sentence, finding in aggravation that (1) the murder was cold, calculated, and premeditated without any legal or moral justification;[3] and (2) merging as one circumstance the aggravating circumstances of murder committed for pecuniary gain[4] and murder committed while engaged in an *124 armed robbery.[5] The only statutory mitigating circumstance found was Hayes's age, which the court deemed to be "a minor mitigating factor."[6] As to nonstatutory mitigating circumstances, the court found that Hayes is of low intelligence; he is developmentally learning disabled; and he is the product of a deprived environment.

I. GUILT PHASE
Hayes raises seven issues in the guilt phase of his trial, only some of which merit discussion.[7] Initially, Hayes argues that two points of identification evidence should not have been admitted. First, we address his claim that the trial court erred in admitting an out-of-court statement identifying codefendant Nathan Watson at the scene of the crime. Witness Bruce Hayes (no relation to appellant) was driving in the neighborhood with his thirteen-year-old son, Sedrick, when they saw the taxi crash. As they watched the men flee the crash, Sedrick said "daddy, that's Nay-Nay and them." (Bruce and Sedrick Hayes knew Nathan Watson by the name "Nay-Nay.") Bruce Hayes then contacted Detective Greg Smith and described what he and Sedrick had seen. When Smith went out to investigate that night, he questioned appellant because the detective knew that appellant and Watson were close friends who spent a lot of time together.
Sedrick's identification of Watson was introduced through Bruce Hayes. Appellant objected to the admissibility of Sedrick's out-of-court statement solely on the ground that it was hearsay. The state argued the evidence was admissible because "a specific exception to the hearsay rule, identification of a witness is not hearsay, [or] is excepted" under the Florida Evidence Code. The trial court overruled Hayes's objection.
Section 90.801(2)(c) of the Florida Statutes (1987) addresses the admissibility of an out-of-court identification. It provides:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
... .
(c) One of identification of a person made after perceiving him.
(Emphasis supplied.) Section 90.801(2)(c) excludes from the definition of hearsay out-of-court statements of identification only when the declarant also testifies at trial. State v. Freber, 366 So.2d 426 (Fla. 1978). Since Sedrick did not testify, the identification was hearsay under the rule, and was inadmissible.
The state now acknowledges that while the statement may not have satisfied the standard of nonhearsay under section 90.801(2)(c), it was nonetheless nonhearsay because it was not offered to prove the truth of the matter asserted, i.e., the fact that Watson was at the scene. Even if the state had timely made this argument at trial,[8] it would be without merit because how Smith came to regard Hayes as a suspect in the case was not sufficiently probative of any material fact at issue to allow its admission into evidence. See §§ 90.401-.403, Fla. Stat. (1987).
Although the trial court did abuse its discretion, we conclude the error does not warrant reversal on these facts. Both codefendants testified that Hayes was not only at the crime scene, but that he planned and committed the murder. Bruce Hayes identified appellant and Watson independent of any identification by Sedrick. Additionally, other witnesses testified that appellant told them of his involvement in the murder. On this record, we find the *125 error harmless beyond any reasonable doubt under the principles enunciated in State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Appellant's other identification issue challenges the admissibility of Bruce Hayes's pretrial identification of appellant in a photographic lineup and his subsequent identification of appellant at trial. The trial court determined that neither the lineup nor the surrounding circumstances were impermissibly suggestive and unreliable so as to taint either identification. Upon review of the record we find no abuse of discretion. See, e.g., Lewis v. State, 572 So.2d 908, 910-11 (Fla. 1990).
Next, Hayes makes various claims regarding the admissibility of a statement he made to Detective Smith. First he argues that his statement should have been suppressed under the dictates of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because his waiver of rights was not voluntary. The record shows that while investigating the murder, Detective Smith saw Hayes in the street and recognized him as a friend of Nathan Watson, who, as stated above, was identified by an eyewitness as a suspect. Detective Smith asked Hayes to answer some questions. Hayes was placed in a squad car and taken to the station for questioning. Hayes signed a Miranda waiver and spoke with the police for approximately forty minutes, after which he left the station. Hayes was not arrested until several months later when other witnesses came forward.
At the suppression hearing, Hayes testified and adduced expert evidence to try to prove that his low intelligence, combined with drug and alcohol use, rendered his waiver involuntary under the totality of the circumstances.[9] The state argues that the principles of Miranda do not apply because the statement was not a product of a custodial interrogation. Alternatively, the state argues that the trial court did not abuse its discretion in finding the statement had been made voluntarily.
The trial court implicitly found that the statement was subject to the constraints of Miranda, concluding that the statement was freely and voluntarily given. Although there may be some question as to whether the statement was made during a custodial interrogation, we find substantial competent evidence in the record to support the trial court's conclusion that the statement was freely and voluntarily made. Hence, we find no abuse of discretion.
Second, Hayes contends that the court erred in admitting at trial Hayes's testimony from the suppression hearing. At that hearing, Detective Smith testified that when he originally questioned Hayes shortly after the murder, Hayes said he had consumed four beers that night. Under cross-examination at that same hearing, Hayes testified that he only drank two beers. At the subsequent trial, Detective Smith testified on direct examination that Hayes had told him he drank four beers, but Detective Smith then said in redirect examination that he heard Hayes at the suppression hearing say he drank two beers. Hayes, who did not testify at trial, objected to the introduction of Detective Smith's statement on redirect, but the trial court overruled the objection.
Hayes argues that the issue here is controlled by Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), in which the Supreme Court held
that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.
Hayes argues that he had the constitutional right not to testify at trial and the right to assert the protections of the fifth and fourteenth amendments at the hearing on his motion to suppress. Thus, he argues, the fair exercise of his constitutional rights must fall within the ambit of Simmons. The state argues that Simmons is limited *126 to protect a defendant's standing to assert a fourth amendment right to exclude impermissible evidence of guilt. We reject the state's argument, instead agreeing with courts that have refused to read the principles of Simmons so narrowly. As Judge Downey noted in Johnson v. State, 537 So.2d 1116, 1117-18 (Fla. 4th DCA 1989):
Lest the reference to Fourth Amendment rights be taken as a limitation on the application of the rule generally, we point out that the Simmons Court made it clear that the rule announced was not so delineated. Rather, the Court said, the analysis applied to any situation in which the "benefit" to be gained is that afforded by another provision of the Bill of Rights. The Third Circuit Court of Appeals followed Simmons in United States v. Inmon, 568 F.2d 326, 333 (3d Cir.1977), wherein that court said:
The reasoning in Simmons is compelling, and we follow it in this case. Inmon may not be required, as [sic] the cost of litigating what he and his counsel believe to be a valid fifth amendment double jeopardy claim, to waive the fifth amendment privilege against self-incrimination in a later trial. If he testifies in the pretrial double jeopardy hearing, his testimony may not be used against him either on the conspiracy count, if the district court rejects his claim, or on the substantive counts.
Accord United States v. Gravatt, 868 F.2d 585, 590 (3d Cir.1989) (when defendant seeks appointment of counsel but refuses to complete financial affidavit based on fifth amendment privilege, he may disclose financial information to court for in camera review or in an adversarial pretrial hearing, but the data may not be used for subsequent tax prosecution); United States v. Garcia, 721 F.2d 721, 723 (11th Cir.1983) (applying Simmons to a pretrial double jeopardy hearing); Pedrero v. Wainwright, 590 F.2d 1383, 1388 n. 3 (5th Cir.) (defendant's statement at arraignment in support of insanity defense may not be used against him at trial), cert. denied, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979); Inmon, 568 F.2d at 333 (applying Simmons to a pretrial double jeopardy hearing).
Because Hayes's statement made in a suppression hearing could not be admitted into evidence at trial over his objection, Hayes's objection should have been sustained. Nonetheless, we are persuaded beyond a reasonable doubt that the error here was harmless in view of all the evidence in this record. See DiGuilio, 491 So.2d at 1129.
Hayes next argues that the trial court erred by restricting Hayes's right to present a defense when it barred evidence of the victim's recent consumption of marijuana and cocaine. Although such evidence may be relevant in some circumstances, it was not relevant to any material issue on the facts of this case. We find no abuse of discretion. Cf. Gunsby v. State, 574 So.2d 1085, 1088 (Fla. 1991) (no abuse of discretion in denying murder defendant the right to cross-examine medical witness about presence of drugs found in victim during autopsy); Lucas v. State, 568 So.2d 18, 22 (Fla. 1990) (victim's drug use was not relevant in penalty phase of capital trial).
Having found no reversible error, either individually or cumulatively, we conclude that substantial competent evidence supports the convictions in this case.

II. PENALTY PHASE
Hayes argues that the trial court erroneously weighed the aggravating and mitigating circumstances. The trial court rendered a very detailed written order elaborating its findings as to all aggravating and mitigating circumstances, including nonstatutory mitigating evidence. The trial court expressly rejected the statutory mitigating circumstances of extreme mental or emotional disturbance,[10] inability to appreciate the criminality of his conduct or conform his conduct to the requirements of law,[11] and that he acted under duress or *127 the domination of another person.[12] Those findings are supported by substantial competent evidence in the record. At the same time, the trial court found that Hayes was eighteen at the time of the crime; he is of low intelligence; he is developmentally learning disabled; and he is the product of a deprived environment. Weighing all those factors in light of the jury's recommendation of death, the court concluded that death was appropriate. We find no reversible error on this record.
Likewise, we find no merit in Hayes's claims that (1) the trial court should not have instructed the jury on the overlapping aggravating circumstances of murder committed for pecuniary gain and murder committed while engaged in an armed robbery, see Suarez v. State, 481 So.2d 1201, 1209 (Fla. 1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986); (2) Florida's capital sentencing statute is unconstitutional on its face and as applied, see, e.g., Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988); and (3) Hayes should have been allowed to supplement the record with the transcript of a hearing on trial counsel's motion to withdraw on the facts of this case.
Lastly, Hayes argues that the death sentence is disproportional punishment. We cannot agree. Hayes does not dispute the trial court's conclusion, supported by the record, that this crime was a premeditated, cold-blooded murder committed during a robbery. The jury recommended death, and this Court has affirmed the death sentence under similar circumstances. Likewise, we cannot find that the death sentence was disproportional when compared to the treatment of Hayes's codefendants because the trial court found, with ample support in the record, that Hayes was more culpable than the other participants. See, e.g., Downs v. State, 572 So.2d 895, 901 (Fla. 1990).
For the foregoing reasons, we affirm the convictions and the sentence of death.
It is so ordered.
SHAW, C.J., and OVERTON and McDONALD, JJ., concur.
GRIMES, J., concurs with an opinion.
BARKETT, J., concurs in part and dissents in part with an opinion, in which KOGAN, J., concurs.
GRIMES, Judge, concurring.
Although not suggested as grounds at the trial level, I believe Sedrick Hayes's statement, "daddy, that's Nay-Nay and them," which he made as he watched the men flee the crash, was admissible as a spontaneous statement under section 90.803(1), Florida Statutes (1987).
BARKETT, Judge, concurring in part, dissenting in part.
I concur in affirming the convictions, but I dissent as to the penalty.
As the majority recognizes, uncontroverted evidence established that appellant, Tony Hayes, had been neglected, abused, and deprived for a substantial portion of his eighteen years on this earth. He was forced to fend for himself on the streets at an early age despite his brain dysfunction and his inability to read, spell, or count beyond the level of a five-year-old child. For three years immediately preceding this murder, including the day of the killing, he heavily abused alcohol, marijuana, and cocaine, never receiving any treatment for his problems.
There is no question that Hayes committed a cold-blooded murder, and that he should be punished most severely for his crimes. However, in passing judgment in capital cases, courts must not lose sight of the individual characteristics that make some people more deserving than others of the ultimate punishment. I do not believe that the citizens of this state ever intended to reserve their harshest punishment for persons like Tony Hayes. Hence, I am convinced that uncontroverted mitigating *128 evidence renders the death sentence disproportional punishment in this case.
KOGAN, J., concurs.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] This effort was not wholly successful, however. A fingerprint expert identified a fingerprint discovered on the right front door of the taxi as Gillam's.
[3] See § 921.141(5)(i), Fla. Stat. (1987).
[4] See id. § 921.141(5)(f).
[5] See id. § 921.141(5)(d).
[6] See id. § 921.141(6)(g).
[7] We reject without discussion Hayes's claims that the trial court erred in its rulings on challenges of prospective jurors, and that numerous errors had the cumulative effect of violating his right to a fair trial.
[8] In order to enable parties to properly and timely debate evidentiary rules at trial, to seek limiting instructions where appropriate, and to facilitate judicial review, parties are admonished that when objecting or responding thereto, they should state their grounds with specificity if the specific grounds are not apparent from the context. See § 90.104, Fla. Stat. (1987).
[9] We also conclude that the trial court did not abuse its discretion in barring certain testimony as beyond the scope of the witness's expertise. See § 90.702, Fla. Stat. (1987).
[10] See § 921.141(6)(b), Fla. Stat. (1987).
[11] See id. § 921.141(6)(f).
[12] See id. § 921.141(6)(e).